There are two issues in this case. The first issue is whether the IJ's adverse credibility determination is supported by substantial evidence. We believe it is not. The major basis for the IJ's adverse credibility finding is the IJ found that a petitioner's statement that she was persecuted by the Chinese government was told by the smuggler when she made that statement at the airport when she arrived in the United States. But the record is clear that she did not testify that she was told by the smugglers to say that. Even the IJ himself did not actually find that the story that she was read that the manager wanted to marry her was told by the smuggler. The IJ only found that it is likely that she told the immigration officer she was persecuted, was told by the smuggler. And the ---- Kennedy Oh, no. Thank you for helping me out. I didn't realize that. I thought this talk about what she said when she got to the airport was her ---- that was the petitioner who was speaking. That's not true? Xu Excuse me, Your Honor. The ---- statement, the IJ was reading part of the record of the airport interview. Kagan Correct. Xu And the petitioner first said she did not recall that part, and then she said I was told that was what the smuggler told us to say. Kennedy Oh, I see. No, but she herself did say that. She doesn't contest that she said that at the interview. Xu Yes, Your Honor. Kennedy Oh, so she's only saying I was told by the smuggler to say that. Xu That's correct, Your Honor. Kennedy Okay. So it was not the smuggler himself or herself who was speaking. It was she who was speaking. Xu Yes, Your Honor. Kennedy Okay. Okay. The IJ is finding that her entire account of the rape was told ---- actually, the IJ did not suggest that. The IJ only suggested that her statement that she was persecuted by the Chinese government was told by the smuggler. Do we know whether when she showed up at the airport, she did this interview because she voluntarily at that time applied for asylum, or whether she was stopped because the immigration authorities thought her documents didn't match, and then she told the story? Xu Your Honor, she was apprehended at the Miami International Airport, and that was where the interview occurred. Kennedy I see. But she wasn't ---- she didn't say as she got to the airport, I'm applying for asylum. Xu No, Your Honor. The record shows she and the other 10 individuals were arrested upon their arrival, and that their ID documents were already collected before they arrived at the airport. Kennedy Okay. Xu The other inconsistencies found by the IJ were not actually present in the record, all minor inconsistencies. In the government's brief, they raised one basis, that is, a petitioner testified she first received her passport, a fake passport, in Hong Kong, then she testified in jail. But that was basically a mistake. She admitted that on the record, and even the IJ found that that was a minor inconsistency. It does not go to the heart of a petitioner's asylum application. And the second issue in this case is assuming petitioner's credibility, whether she has established a well-founded theory of future prosecution on account of protected ground. We believe she has established that. After she was raped by the manager, who is a government official, petitioner wrote a letter to the local government reporting the crime, and also stated that the manager was appointed by another high-ranking local official to the position, and she expressed that these kinds of government officials' corruption should not exist. And after that, the local police authorities went to her home, tried to arrest her many times, and even after she left China, they were still looking for her. And I believe this is a prosecution on account of imputed political opinion. And also, this Court has held that exposure of the government corruption may constitute political activity sufficient to form the basis of a prosecution on account of political opinion. Let me come back, if I might, to the adverse credibility finding. There were a couple of issues or a couple of grounds on which the IJ found adversely Esther's credibility that I wanted to address. One was the IJ found it implausible that having been slapped would render her unconscious for what she estimated upon cross-examination to be an hour. How do you respond to that? Your Honor, that's not actually what petitioner testified. Petitioner testified that she felt down before or after the manager hit her on her head, but she did not know exactly what caused her unconsciousness. And later she told the psychologist she may hit her head on the corner of the table, but she actually did not know exactly what caused her unconsciousness. The IJ only, based on the petitioner's testimony, that she was hit by the manager, that was the last thing she remembered before she rendered unconsciousness. The second issue of adverse credibility that I'd like to ask you about is the IJ said that she didn't know who the person was who was the high-ranking official in the local town who was related to or the protector of the manager, but a written statement earlier had said, by her, had said that he was the governor of the town. How do you respond to that? Your Honor, she actually, during the testimony, she actually stated that the relative of the manager was a government official. She did not say the position of that person, but she did say it's a government official. Correct. But previously, in the written statement, she had written governor, and I'm wondering if that was an imprecise translation. I mean, governor, I'm not sure who's translating for her and who's writing that. Yes, it's possible it's just a translation inaccuracy, or it's just she, in her asylum application, she stated it's a governor, but during the testimony, she just stated it's a government official, did not say exactly what position he held. And I've got one last question, assuming credibility, and so we go to the point as to whether or not we now have persecution on account of some political ground. I take your point that she writes a letter that complains about corruption in the government and protection of a factory owner such as this person, and thereafter, the police come looking for her twice at her home. For purposes of the persecution on account of protected ground, what bad things that happen to her do we get to look at? Do we get to look at only those things that happen to her after she has complained about government corruption, that is to say the police coming to the house twice, or do we also get to look earlier at the rape? Your Honor, we concede that there is no past persecution in this case, but we now argue there is a well-founded fear of persecution. And if we, I believe we should look first at the fact the rapist is a government official, and he has connections, and when the petitioner reported the crime to the government, they perceive this as an action against the government, not only against that corrupt official. So I believe we should look at all the facts in total and reach the conclusion that the government would persecute her because of the imputed political opinion or political opinion because she exposed the government corruption. Okay, thank you. I've taken you over time. Let's hear from the government, but we'll give you a moment to respond afterwards. Thank you, Your Honor. Thank you, Your Honor. When you're ready. Good morning, Your Honor. Good morning. Good morning. May it please the Court, my name is Jacob Besheriff, and I'm here on behalf of the Attorney General of the United States. The sole issue in this case were that substantial evidence supports the immigration judge's finding of adverse credibility. No, that's not the sole issue. The second issue is if we find, if we reverse that adverse credibility, does this rise to the level of sufficient persecution or fear of persecution to warrant asylum? Your Honor, there is the main issue in this case that deals with adverse credibility. The second issue that the immigration judge pointed out is that he said that even if the petitioner was found to be credible, there is nothing on the record that would support her claim that she was persecuted on one of the five protected grounds of the Immigration Nationality Act. Right. So we have both issues in front of us. Just as a technical matter, I want to make sure I understand. If we were, and I'm not saying we will, if we were to reverse the adverse credibility finding and hold that her testimony is credible, Yes, Your Honor. can we reach the question as to whether this amounts then to sufficient fear to warrant asylum, given that the IJ himself also reached that question, or do we need to remand under Ventura? Your Honor, because the immigration judge did make a finding that besides being not credible and providing implausible testimony, the petitioner failed to show that she was persecuted on one of the five protected grounds, this Court does have this ability to look at that claim if this panel reverses the immigration judge's first finding of adverse credibility. Yes, so we don't need to do a remand. We don't need to remand under Ventura. Okay, got it. Whereas here the BA adopts and affirms the immigration judge's decision while adding its own reasoning, the Court reviews both decisions. I would like to point out, in light of what the petitioner's counsel stated, about the IJ's finding of adverse credibility. Therefore, the petitioner was given an opportunity to present her case before the Immigration Court and before the Board of Immigration Appeals, and she was afforded all the due process that was due to her. She got a fair hearing, and it appeared to that the immigration judge's adverse credibility finding goes to the heart of the asylum claim. Specifically, what I would like to point to that, she provided a statement, at least on two occasions, to the U.S. immigration officials. Then she testified in court, in the Immigration Court, and then she had another interview with her psychologist, Dr. Wing. When she was initially interviewed by the United States immigration officials, when she was apprehended at the Miami International Airport on a forged and lent to Malaysian passport, a forged and substituted Malaysian passport, she stated that the manager that allegedly raped her wanted just to marry her. Then at the second interview that was conducted 16 days later, which was a credible determination, a credible fear interview by the United States immigration officials, she stated that he wanted her to be her girlfriend. And then she testified in court, and then as the story progressed, when she submitted her asylum application, then she claimed that he raped her, and then she testified in court that he raped her, and then it went further that she was persecuted on account of her political opinion, because apparently she complained to the government, the local government, that the manager was corrupt, and he's being shielded by some high-ranking relative. It appears that the story that the petitioner presented is not only internally inconsistent, but externally inconsistent. She also failed to provide any evidence whatsoever to corroborate her testimony. Nothing in the record suggests that after she was raped, she went to see a doctor, and the immigration judge did point out to that. She claimed that she was knocked out unconscious, and in her statement to her psychologist, she indicated that she fell down and hit on the corner of the table, but then she didn't go and see a doctor about being injured. I mean, this is ‑‑ and it appears that if the immigration judge, as you point out, that being slapped and being knocked out unconscious, that's a very, very inconsistent statement, because it's not reportable. Let me ask you, counsel, did you find persuasive what the immigration judge had to say about the inherently incredible character of not going to the doctor after being raped? I call your attention to what the immigration judge said. Upon returning home, she didn't see a doctor for either her rape or any possible injury to her head or brain. This is inherently improbable testimony, and obviously the testimony of someone who has never been knocked unconscious nor raped, which led me to wonder whether the immigration judge was speaking out of what he thought to be his own experience of having been knocked unconscious or raped. You know, as a trifecta, the trifecta, I think, in this context, we have an immigration judge who has certain experience, and from his understanding that when somebody tells you that they were raped or knocked out unconscious and they did not go to see a doctor, and then there's no information about the injury, nothing whatsoever shows that, you know, this person actually went through something. There's no indicia of what happened. Are you asking, are you suggesting that deference is owed to the immigration judge's experience with respect to whether a person who's raped would go to a doctor in China? Under Chevron deference, the agency's afforded deference in the interpretation of Immigration and Nationality Act. And when Immigration and Nationality Act vests the power to give an immigration judge the power to adjudicate this type of claims and look at the facts and see the inconsistencies, and looking not only at this particular inconsistency as to being raped, but taking it as the whole, it seems entirely plausible that the immigration judge, after hearing what she had to say about providing a full statement to U.S. immigration officials specifically, when she stated that she said that she got her passport in Hong Kong and then- No, let's not talk about Hong Kong and Chile. We were talking about the rape and not going to a doctor, and the immigration judge drawing from that that it is inherently improbable testimony, and going on to say that it's preposterous to believe that the respondent could have been knocked unconscious and so forth. I think you said something about drawing on the immigration judge's experience? Your Honor, in order to obtain reversal of the agency's decision, the evidence not only has to support it, but it has to compel it. In other words, that to reverse the finding of the agency, the court, the evidence has to be compelled. It has to, a reasonable fact finder has to look at them and say, well, the evidence compels the reversal. Nothing here compels the reversal. The immigration judge, from his perspective as a trifecta, looked at the case. He determined that in this particular situation, Petitioner provided an incredible and plausible testimony. And under the substantial evidence standards, which is highly deferential under the lines of crisis as was put in the statute- With respect to the language that I read you, I'd like to be advised. Well, I don't want to delay you on it. Your Honor, that's a good question. And if it was an interpretation, or if it, and the government's position is that on the highly deferential substantial evidence standard, it does include this type of findings by the immigration court. When the immigration judge looks at the evidence, and when he may be in this situation, based upon his experience, as a trial judge, I mean, he made that determination. Well, let me ask you a different question, but also focused on reasons given by the I.J. for finding her incredible. The I.J. says, and I'm reading from page 9 of his order, referring to it, that when she shows up for her airport interview, she says things that are pretty mild, that is to say, annoying me, wanted to marry me, and she's afraid she'll be killed if she goes back, but does not mention the rape. Then the I.J. writes, however, 16 days later, after she had employed counsel, Raponette's story was expanded upon, and now the story includes the rape. How do we know that she had employed counsel by that time? Your Honor, that's a good question. What appears to be that, if we, if you indulge me, I think there's a direct entry of appearance or something to it that when she was, she had a credible fear of injury, I believe that she was represented. And if I may verify it quickly. You're probably headed for AR 376. Yeah, it's 3, I'm looking at right now administrative record page 380, and if I may. 380? Yes, Your Honor. Okay. 380. That's the credible fear injury. Right. I'm looking at the back where she, just want to make sure. Your Honor, I think, I cannot find evidence that she was represented at that credible fear injury by an attorney. I think probably the immigration judge misspoke and demands that her asylum application or she did employ an attorney when she applied for her asylum application. But if that's so, then, when she shows up for her credible fear interview. She was actually detained at the detention facility. But, you see, the very strong implication of what the IJ says is that her story got better after she hired a lawyer who told her what to say. But you're now saying there's no evidence in the record that she, in fact, had hired a lawyer. There is. I cannot see anything in the record that would suggest that she was employed an attorney at her credible fear injury, but she did, in fact, employ an attorney when she applied for it. When she submitted her asylum application. I understand. But just to make sure that we're on the same page. Yes, Your Honor, I understand. You are abandoning any defense of the IJ saying that she saw a lawyer before she included in the story that she had been raped. Yes, Your Honor. Okay. Let me ask you something else. And I'm now on page 10 of the IJ's opinion or decision. The first full paragraph, second sentence, the IJ writes, It's also difficult to understand how the report of the respondent's psychologist can state that the respondent is suffering today from the memory of her rape, while the respondent claims that she does not remember her rape because she was unconscious. How am I supposed to understand that statement? Well, I cannot speak for the IJ, and I cannot say what he meant. But it appears that he probably meant that the story that was provided, and as to what she testified as far as her being slack, and that the details that are taken altogether do not really make much sense to him. So I'm not sure that the IJ can say that the respondent is suffering from the memory of her rape. I'm not sure that the IJ can say that the respondent is suffering from his experience as a trial judge, something that Judge Pollack was referring to. Well, in a way, that's precisely my point, which is he may be testifying, or rather he may be concluding from his own experience, which, of course, cannot include being a woman, and so far as we're aware, he's never suffered male rape. But let me focus on this particular sentence. He seems to be discounting her psychologist's conclusion that she's suffering today some trauma from the rape. The psychologist writes that she's had difficulties with her relationships with men tied to her inability to have satisfactory sexual relations. I mean, this is her own testimony about this, and it's because of the rape. He doesn't believe it, he says, because she was unconscious when she was raped, and she therefore can't remember the rape. Do you want to defend that statement, or do you just want to say, you know, I'm not comfortable relying on that conclusion? Your Honor, if I may answer your question in the following fashion. When the IJ, as in this case, wrote his opinion, he was, so to say, shooting from the hip. It doesn't mean that the decision in itself, I mean, it has to be clear, the court has to look at the facts and has to understand the facts. But sometimes it's very difficult to word it in a way that would appear that, as in this case, what he was pointing out to that he was disagreeing with what the psychologist said in light of all the inconsistencies that she provided in her testimony, in her documentation that she submitted in support of her zonal implication, and in her interviews with the U.S. immigration officials. He was looting, he was looking at her statements through the prism of the inconsistency, and that's what appears to be, because her prior statements seem to be highly improbable, and that's why when he was looking at that report, he tweeted and lied all the statements that she made, if it answers your question. I guess I don't understand the answer. I think Judge Fletcher was wondering whether the government is asking this court to rely on the immigration judge's obvious discounting of the psychologist's report. Your Honor, I would respectfully disagree that the immigration judge discounted the report. He waited in light of all the evidence that she provided, and as he pointed out to the inconsistencies between the psychologist's report, her own testimony, and the statements that she made in support of her zonal implication. I think that the statement that he made as far as her being raped might be a little bit harsh, but it was the way he looked at the evidence, he looked at it in its totality. He was trying to determine her credibility, how credible her claim was, and apparently the statement was, and the I.J. believed from that statement, that her entry with the psychologist was self-serving, so. Any further questions from the bench? Thank you. Thank you, Your Honor. The case of Zhu v. Mukasey is now submitted for decision.
judges: Fletcher, Gould, Pollak